## BALTIMORE AND OHIO RAILROAD COMPANY
### v. MAURER.

[No. 10,398.    Filed May 13, 1920.]

1. CARRIERS.—*Interstate Commerce.—Carriage of Live Stock.— Liability of Connecting Carriers.*—Connecting carriers concerned in handling interstate shipments en route are not primarily liable unless the loss, damage or destruction complained of occurs on their line, in view of the Carmack Amendment of June 29, 1906, U. S. Comp. St. §§8604a, 8604aa.    p. 303.

2. CARRIERS.—*Carriage of Live Stock.—Failure to Give Possible But Unusual Service.*—The failure of a carrier to transport live stock on a fast train, advertised to carry perishable freight only, and which did not stop at the point of destination involved, was not negligence, since there was not only no duty upon the carrier to receive and forward such shipment by such train, but it had no legal right to do so, as by so doing it would be giving the shipper unusual service not equally open to all persons.    p. 303.

3. CARRIERS.—*Carriage of Live Stock.—Evidence.—Sufficiency.* —Evidence that a terminal carrier shortly after delivery to it by a connecting carrier discovered that the cattle, which were shipped under a 36-hour time limit for unloading, feeding and rest, had already been confined 31 hours, that such carrier's next available train for destination did not leave until at or near the expiration of such time limit, and that the stock were promptly turned back to the connecting carrier, who accepted, unloaded and fed the cattle, and after so doing reloaded and redelivered them to the terminal carrier, the loss of one head occurring meanwhile and before the terminal carrier accepted the car for shipment, does not show a common-law liability against the terminal carrier; and in such a case it makes no difference whether the shipping contract, containing restrictive provisions, was valid or not.    p. 304.

From Laporte Circuit Court; *James F. Gallaher,* Judge.

Action by Joseph Maurer against the Baltimore and Ohio Railroad Company.    From a judgment for plaintiff, the defendant appeals.    *Reversed.*

M. R. Sutherland and Ralph N. Smith, for appellant.
L. Darrow and Earl Rowley, for appellee.

ENLOE, J.—The complaint upon which this case was tried consisted of one paragraph, wherein appellee sought damages from appellant for alleged negligence in its handling of a carload of cattle.

The complaint alleged the shipment of the cattle by plaintiff from Bancroft, Wisconsin, to Union Center, Indiana, a station on the line of appellant's road.

It appears from the averments of the complaint that the cattle were loaded at Bancroft on November 14, 1916, and were shipped from that point in the afternoon of that day; that said car contained, when started, thirty-seven head of cattle; that it was delivered to appellant at its receiving yards at Wolf Lake, near Hammond, Indiana, in good condition, at 4:30 p.m. on November 15, 1916; that said car of stock had been shipped with a time limit for unloading, feeding and rest of thirty-six hours; that the distance from said yards at Wolf Lake to Union Center is about fifty miles; that said cattle were carelessly, negligently and wantonly permitted to remain in said car at Wolf Lake from 4:30 p.m. November 15, 1916, until the morning of November 17, 1916, without food and water, when they were turned over by appellant to the Union Stock Yards Transfer Company at its designated feeding place in said stockyards, where the said cattle were unloaded and fed 400 pounds of hay on the morning of November 17, 1916; that said cattle were not delivered to appellee at Union Center until November 18, 1916, at noon; that appellant carelessly and negligently failed to deliver to appellee one polled Angus cow of the value of $300; that the other cattle and calves, on account of lack of proper care and attention on the part of appellant, and the failure to feed them, and on account of delay in shipment by the appellant, were starved, gaunt, and weakened from the lack of care and attention; that said cattle were emaciated, sickened, and greatly reduced in weight

on account of such lack of care and attention; that, after said car of cattle arrived at Wolf Lake yards, the appellant company had ample time and means of delivering said car of cattle to Union Center, Indiana, its destination, before the thirty-six-hour limit would have expired. There was prayer for damages in the sum of. $800.

This complaint was answered in four paragraphs, the first being a general denial. The second paragraph alleged that said cattle were shipped under a special contract, limiting the carrier's liability for loss or injuries to said cattle to certain values declared by said shipper and stated in said contract. The third paragraph of answer was also based upon said special contract, and relied upon paragraph five thereof, which was as follows: "The shipper agrees to load, unload and reload all of said stock at his own expense and risk, not to load different kinds of stock in the same car except as provided in the tariffs; to properly and securely place all of said stock in the cars; to feed, water and attend the same at his own expense and risk while in the stockyards of the carrier, while on the cars, at feeding or transfer points and whenever same may be unloaded for any purpose, also to keep the doors of such cars securely fastened so as to prevent escape by such stock therefrom. That all necessary care and attention shall be given said stock at regular stopping stations and while the train is not in motion."

The fourth paragraph of said answer was also based upon said contract, and set forth in detail appellant's connection with said shipment, and avers that appellant received only thirty-six head of cattle for such transportation, and that said number so delivered were duly carried by it to the place of destination, and duly delivered to the appellee. A copy of said special contract

was attached to said affirmative paragraph of answer as an exhibit.

To said second paragraph of answer appellee filed a paragraph of reply alleging that said initial carrier refused to accept and ship said car of cattle unless he, appellee, signed and executed said contract; that said initial carrier also refused to receive and ship said cattle at a higher valuation than that named in said contract—which was: bull, $75; cow, $50; calf, $20— although he, the appellee, then and there informed the agent of said carrier that his said cattle were worth much more than the figures named—to wit, that they were of the value of: bull, $400; cow, $200; calves, $50—and that therefore said contract was not binding upon him.

Appellee also filed an affirmative reply to said third paragraph of answer, alleging that he was by said initial carrier compelled to sign said contract, and compelled to agree to accompany said cattle, etc., and that therefore said contract was not binding upon him.

To appellant's fourth paragraph of answer appellee replied in general denial, and the issues thus formed were submitted to a jury for trial, which returned its verdict in favor of appellee in the sum of $250. Appellant's motion for a new trial having been overruled, it prosecutes this appeal, and has assigned as error the overruling of its said motion.

The causes for a new trial set forth in said motion, and not waived on this appeal, challenge (1) the sufficiency of the evidence to sustain the verdict; (2) the verdict as being contrary to law; (3) error in giving certain instructions; (4) error in refusing to give certain requested instructions; and (5) error in admitting certain testimony.

This was an interstate shipment. The cattle in ques-

tion were shipped from Bancroft, Wisconsin, over the Minneapolis, St. Paul and Sault Ste. Marie Railroad, and were carried by said railroad to its yards in the western part of Chicago, where the car was taken by an engine of the Belt Railway of Chicago, and by it delivered at the receiving yards of appellant company at Wolf Lake.

The facts disclosed by this record, and about which there is no dispute, may be stated as follows: The cattle were loaded at Bancroft, Wisconsin, on November 14, 1916, between 9 and 10 a.m., the notation on "waybill" saying "loaded 9:30 a.m. 11/14," and the appellee testifying, "I did not look at my watch, but as near as I can remember it was around ten o'clock"; that they arrived at Chicago at about six o'clock next morning; that thereafter said car was taken by a switch engine of the Belt line and delivered at the receiving yards of appellant company at Wolf Lake, in apparent good condition, at 4:30 p.m.; that said stock had been shipped, as noted on the waybill, under a thirty-six-hour limit for unloading, for feed, water and rest, as provided for by federal statute; that the next regular train of appellant, east-bound, stopping at Union Center or carrying freight for that station, was scheduled to leave Wolf Lake at 10:45 p.m.; that there was no feeding yards at Wolf Lake, or between Wolf Lake and Union Center, where said cattle could have been unloaded for feed, water and rest; that one of appellant's trains for the east left said Wolf Lake yards at about 7:35 p.m. of each day, but that said train carried only perishable freight for Pittsburgh, Pa., and points beyond.

The record further shows that the belt conductor at the time he delivered said car of cattle in question to appellant, on November 15, also delivered in the same train nine other loaded cars, and eight empty cars, and that the switch engine pulling said train stopped near the yard office of appellant at said yards, and said con-

ductor at once went into said office and delivered the several waybills for said cars so delivered to a clerk working in said office; that said engine was immediately uncoupled from said train and said conductor and said engine returned to its own yards; that shortly thereafter the clerk to whom said waybills had been so delivered by said conductor, in looking them over and examining them, discovered that the car of stock in question, as shown by the said waybill, had been then confined in said car for more than thirty-one hours consecutively, and that the same had not been delivered through the Union Stock Yards, Chicago; that the terminal trainmaster of appellant, on learning of the time said cattle had been so confined in said car, directed the yardmaster of appellant not to receive said car of cattle and to turn the same back to the said Belt Railroad; that it was so turned back to said Belt Railroad that same evening, and was taken out of and away from said Wolf Lake Yards of appellant at 8:45 p.m. of said date; that appellant refused to receive said car, and turned it back because of said thirty-six-hour time limit; that thereafter said car was taken by said Belt Railroad to the Union Stock Yards and delivered to the "feeding chute," to be unloaded, and the cattle fed, and watered; that thereafter said cattle were unloaded, fed, and watered at said stockyards; that said cattle were again reloaded at about 6:50 p.m. of the 17th, and then taken again to said Wolf Lake Yards of appellant and delivered to appellant; that appellant thereafter handled said car and delivered the same at Union Center, on the morning of November 18, at about 8, or 8:30 o'clock; that, when said cattle were so reloaded at said Union Stock Yards, there were placed in said car but thirty-six head, being twenty-seven cattle and nine calves, all of which were delivered to appellee. The charges of negligence averred in the complaint, as against appel-

lant are: "Negligently and wantonly failing to ship said cattle after their arrival at Wolf Lake, and negligently and wantonly keeping said cattle in said yards from 4:30 p.m. of November 15th, 1916, to the morning of November 17th, 1916, without food and water," and in negligently failing to deliver one cow, alleged to have been delivered to appellant. The other charge of negligence is as follows: "That said defendant company had a double track from its yards at Wolf Lake to Union Center, Indiana, and runs numerous trains and frequent freight service from Wolf Lake Yards to Union Center and points to the east, and that at the time of delivery of said car at the Wolf Lake Yards, Hammond, Indiana, the defendant had ample time and means of delivering said car to Union Center, Indiana, before the thirty-six hour limit would have expired."

The complaint in this case proceeds upon the theory of a shipment of said car of cattle in question under a common-law liability. The appellant asserts: (1) That the shipment in question was under a special contract, limiting any claim for damages for loss or injury to the values stated in said contract; and (2) that if it should be held that said special contract was invalid, for the reasons urged against it by appellee in his said paragraph of reply, still, under either theory, there is no evidence to sustain the verdict, for the reason that all the evidence shows that appellant was not negligent in transporting said car of stock *after* it received it; and further that the evidence shows that it received only twenty-seven head of cattle and nine calves, thirty-six in all, and that it had thereafter delivered all the cattle so received to the appellee.

This being an interstate shipment, the rights of the parties are governed by what is known as the Carmack Amendment of June 29, 1906. That act imposes upon

the *initial carrier* a liability for goods lost, damaged, or destroyed in transit, without regard to connecting carrier or carriers, on whose line or lines such loss, injury, or destruction may have occurred, and this without reference to whether the initial carrier was, or was not, negligent, and also without regard to whether such negligence, if any, in any way contributed to such loss, damage, or destruction of such goods. But, as to connecting carriers concerned in handling such shipment en route, they are not primarily liable, unless such loss, damage, or destruction occurs on their line. *Houston, etc., R. Co.* v. *Reichardt* (1919), (Tex. Civ. App.) 212 S. W. 208, and authorities cited; *Hudson* v. *Chicago, etc., R. Co.* (1915), 226 Fed. 38; Judson, Interstate Commerce (3d ed.) §504.

The appellee in his brief argues that as the evidence shows that the car in question arrived at the Wolf Lake Yards of appellant at 4:30 p.m., and that as appellant had a train leaving said yards at about 7:30 p.m. of the same evening, and which train would arrive at Union Center, Indiana, at not later than 9:30 p.m. of said date, it was the duty of appellant to forward said cattle by said train, and that it was negligent in not so doing.

It will be borne in mind that said 7:30 p.m. train was a fast freight train, which carried, as advertised to the public, only perishable freight, for points beyond Pittsburgh, Pa.; that said train was not scheduled to stop and deliver freight at Union Center.

Under these facts, there was not only no duty resting upon appellant to receive and forward this car of cattle by this train, but it had no legal right so to do; to do so would be to give one shipper an "unusual service" not equally open to all persons—something which it could not legally bind itself to do, even by a special con-

tract.  *Chicago, etc., R. Co.* v. *Kirby* (1912), 225 U. S.
155, 32 Sup. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914A
501.

Again, appellee prosecutes this action upon the theory
of a common-law liability.  He, by his pleadings and
also by his testimony, repudiates the agreement for
shipment, as entered into with the initial carrier, as
having been forced upon him, and he seeks to repudiate
the agreement in its entirety.  If he follows his position
to its logical conclusion, then when said car reached
the yards of appellant at Wolf Lake, said cattle had then
been confined for a period greater than the law allowed,
and appellant could not then legally receive and forward
them.

In the determination of this case it can make no
difference whether said contract with initial carrier is
valid or invalid.  Upon the record before us we
3.  must hold that there is no evidence to sustain the
verdict, and that it is therefore contrary to law.

That appellee has suffered substantial damages by the
negligence of some one, upon the record before us, is
manifest, but he is not entitled under the law to exact
that damages from appellant without a showing that ap-
pellant has been in some way negligent, causing him the
loss.  The fact that some employe of appellant, at the
time said cattle were delivered at said Wolf Lake yards,
told appellee that he need not stay with said cattle, and
that they would take care of them, can make no differ-
ence as to the result in this case.

Coming to the conclusion we have, other errors as-
signed need not be considered.  The judgment is re-
versed, with instructions to the trial court to sustain
appellant's motion for a new trial, and for further pro-
ceedings.